

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-28-2003

# Krystal Cadillac v. GM Corp

Precedential or Non-Precedential: Precedential

Docket No. 01-2952

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Krystal Cadillac v. GM Corp" (2003). *2003 Decisions.* Paper 317.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/317

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 28, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 01-2952

———————

KRYSTAL CADILLAC-OLDSMOBILE GMC TRUCK, INC.,
Appellants

v.

GENERAL MOTORS CORPORATION AND GENERAL
MOTORS ACCEPTANCE CORPORATION,

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Judge: Hon. Sylvia H. Rambo

———————

Argued: September 19, 2002

Before: SCIRICA,*_Chief Judge_, ALITO, and
MCKEE, _Circuit Judges_

(Opinion filed: July 28, 2003)

GERARD J. JACKSON, ESQ.
 (Argued)
1260 Marlkress Road, Suite 2
P.O. Box 1820
Cherry Hill, NJ 08034-0109
_Attorney for Appellant_

———————

* Judge Scirica began his term as Chief Judge on May 4, 2003.

JAMES A. MOLLICA, ESQ. (Argued)
TIMOTHY MURRAY, ESQ.
450 Trimont Plaza
1305 Grandview Avenue
Pittsburgh, PA 15211-1205
*Attorneys for Appellees*

---

## OPINION OF THE COURT

---

McKEE, *Circuit Judge.*

Krystal Cadillac-Oldsmobile-GMC Truck, Inc., a Chapter 11 debtor, appeals an order of the District Court affirming the Bankruptcy Court's dismissal of the suit Krystal filed against GMC for breach of contract and related causes of action. The District Court concluded that the Bankruptcy Court correctly relied upon the doctrine of judicial estoppel in dismissing all of the counts in Krystal's complaint. We agree that judicial estoppel was properly invoked by the Bankruptcy Court, and we will affirm the order of the District Court.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Termination of the Franchise Agreement

Since 1987, Krystal Cadillac has operated a General Motors automobile dealership in Gettysburg, Pennsylvania pursuant to a franchise agreement with GM. Under the terms of that agreement, Krystal maintained a line of credit from a financial institution in order to finance Krystal's purchase of new GM vehicles.[2] In October 1991, Krystal

---

1. The District Court had jurisdiction pursuant to 28 U.S.C. § 548(a). We have appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291.

In reviewing the decision of the District Court, we apply the same standard of review the District Court employed in reviewing the Bankruptcy Court's decision. We review factual findings for clear error, and we exercise plenary review over any legal conclusions. *See In Re Woskob*, 305 F.3d 177 (3d Cir. 2002).

2. Article 6.4.1 of the Dealer Agreement between Krystal and GM requires Krystal "to have a reasonable quantity and variety of . . . Motor Vehicles in inventory." Article 10 requires Krystal "to maintain a separate line of credit . . . to finance its purchase of new vehicles."

lost its "floor plan" financing with General Motors Acceptance Corporation, GM's financial arm, and Krystal was not able to secure any other financing. This constituted a default under the franchise agreement. Consequently, on July 13, 1993, GM notified Krystal that GM intended to terminate the dealer agreements. Following an extension, that termination was to become effective on August 12, 1993. However, on August 11, 1993, the day before the termination became effective, Krystal initiated a proceeding before the Pennsylvania Board of Vehicle Manufacturers, Dealers, and Salespersons ("Vehicle Board") challenging the legality of the franchise termination.[3]

The Vehicle Board held a hearing on Krystal's petition on August 8, 1994, and entered an Order and Adjudication upholding GM's termination of the dealership agreements on September 27, 1994.[4] Krystal thereafter appealed that Order to the Commonwealth Court of Pennsylvania, but

---

3. The Board of Vehicles Act of December 22, 1983, P.L. 306, *as amended*, 63 P.S. § 818.9)(c) provides, in pertinent part, the following:

> Canceling of franchises.—It shall be a violation of this act for any manufacturer, distributor, officer, agent or any representative whatsoever of a vehicle manufacturer to unfairly, without due regard to the equities of said dealer and without just provocation, cancel the franchise of any vehicle dealer . . . . At any time before the effective date of such termination . . . the dealer or distributor may appeal to the board for a hearing on the merits, and following due notice to all parties concerned, such a hearing shall be promptly held. No such termination . . . shall become effective until final determination of the issue by the board. In the event of a dealer . . . appeal of the termination . . . of its franchise, the burden of proof shall be on the manufacturer or importer to show that such termination . . . was based on the dealer's failure to comply substantially with the reasonable and material requirements of the franchise. The manufacturer shall not meet its burden of proof to terminate . . . the franchise if the acts of the manufacturer, in whole or in significant part, caused the dealer to be unable to comply substantially with the reasonable and material requirements of the franchise.

4. The Board found that GM's termination of Krystal's franchise was proper because Krystal had failed to comply with the reasonable and material franchise requirements for obtaining a line of credit, and had failed to maintain an adequate inventory of new vehicles.

that court affirmed the ruling of the Vehicle Board on November 6, 1995.

## B. The Proceedings in the Bankruptcy Court
### *(Krystal I).*

On September 8, 1994, (approximately three weeks before the Vehicle Board rendered its decision), Krystal filed for Chapter 11 protection. Thereafter, on June 15, 1995, Krystal filed a Plan of Reorganization in which it provided for the sale of its GM franchise in order to raise funds to pay creditors. GM objected to the plan arguing that it had properly terminated the franchise agreement with Krystal pursuant to the terms of that agreement. The appropriate state agency had upheld the termination, and the Commonwealth Court had affirmed the agency's determination that the termination was proper. Thus, according to GM, the franchise was not an asset of the estate available for sale in the bankruptcy proceedings. On October 24, 1995, Krystal filed an Amended Reorganization Plan and an Amended Disclosure Statement. Article V of the Disclosure Statement stated:

> Debtor also holds an Automobile Franchise Agreement with General Motors Corporation. However, the status of this franchise is now in litigation. General Motors terminated the franchise prior to the commencement of the case and the matter was in litigation at the time the Chapter 11 petition was filed. General Motors nevertheless proceeded with termination and the matter is now on appeal in the Commonwealth Court. Debtor takes the position, which is vigorously contested by General Motors, that this franchise agreement remains an asset of the case.

GM responded by filing a separate objection to the plan and disclosure statement based upon its continuing contention that Krystal's franchise was not an asset of the estate and could not be sold by Krystal or the Trustee to satisfy Krystal's creditors.

The Bankruptcy Court affirmed GM's objections and ruled that the franchise had been validly terminated by GM. Accordingly, the court held that the franchise could

not be sold as part of the bankrupt's estate. The District Court subsequently affirmed that ruling, and Krystal then appealed to us. We reversed. We held that inasmuch as Krystal had filed for bankruptcy before GM terminated the franchise agreement, GM's termination of that agreement was a violation of the automatic stay imposed under § 362 of the Code. *See, In Re Krystal Cadillac Oldsmobile GMC Truck, Inc.,* 142 F.3d 631 (3d Cir. 1998) *("Krystal I").*[5]

## C. Krystal II: The Instant Dispute

On September 25, 1998, Krystal filed the instant action in the District Court for the Eastern District of Pennsylvania against GM. Krystal's claims for relief arise from GM's violation of the automatic stay by terminating Krystal's franchise agreement after Krystal filed for Chapter 11 protection. More specifically, Krystal seeks damages on each of the following seven grounds: (1) violation of the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362(h); (2) breach of contract; (3) violations of Federal Dealer's Day in Court Act, 15 U.S.C. § 1221 and of the Pennsylvania Board of Vehicles Act, 63 P.S. § 818 et seq.; (4) conspiracy; (5) conversion; (6) tortious interference with contractual relations; and (7) violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7.

The Eastern District Court referred Krystal's suit to the District Court for the Middle District of Pennsylvania because the claims were interwoven with the bankruptcy action then pending in the Bankruptcy Court for the Middle District. Although GM filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court never ruled on that motion. Rather, the court *sua sponte* dismissed Krystal's complaint in its entirety under the doctrine of judicial estoppel. In doing so, the court noted that Krystal's complaint could

---

5. We concluded that, under Pennsylvania law, termination of a franchise does not become effective "until final determination of the issue by the board." *Krystal Cadillac,* 142 F.3d at 636 (3rd Cir. 1998). Since the Vehicle Board did not issue its final determination on Krystal's appeal of GM's purported termination until after Krystal filed for bankruptcy, the subsequent termination of the franchise was a violation of the automatic stay and therefore invalid. *Id.*

also be dismissed for (1) failure to state a claim upon which relief could be granted, and (2) expiration of the applicable statutes of limitations. As noted above, the District Court affirmed the Bankruptcy Court's application of the doctrine of judicial estoppel, and this appeal followed.[6]

## II. DISCUSSION

Krystal makes several arguments as to why judicial estoppel was improperly applied here. However, before we address any of those specific arguments, it will be helpful to first provide a brief overview of that doctrine as a framework for our analysis.

### A. Judicial Estoppel In General

We first articulated the doctrine of judicial estoppel in *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510 (3rd Cir. 1953). There, we stated that "a plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." *Id.* at 513. In doing so, we recognized the intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from "playing fast and loose with the courts." *Id.*[7] (internal quotation marks omitted).

Since *Scarano*, we have consistently stated that the doctrine should only be applied to avoid a miscarriage of justice. *See Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3rd Cir. 2001). Thus, in *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d

6. Krystal's bankruptcy case was still pending in Bankruptcy Court when this case was argued.

7. *See also, Delgrosso v. Spang and Co.*, 903 F.2d 234 (3rd Cir. 1990) (stating that unlike the concept of equitable estoppel, which focuses on relationship between parties, judicial estoppel focuses on relationship between litigant and judicial system, and seeks to preserve integrity of system).

355, 358 (3d Cir. 1996), we stated: "[t]he basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.*

Judicial estoppel is therefore not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be. *See, In re Chambers Development Co., Inc.*, 148 F.3d 214 (3rd Cir. 1998). In *Montrose Medical Group,* we identified certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine. We concluded:

> First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent.* Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* —i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

243 F.3d at 779-80 (emphasis added) (citations omitted). We also noted that equity requires that the presiding court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position. *Id.* at 780.

With these principles in mind, we turn to Krystal's alleged inconsistent representations here.

## B. Krystal's Inconsistent Representations

As noted above, each of the claims in Krystal's seven count complaint is related to, and arises from, GM's termination of Krystal's Franchise Agreement. The primary claim is the violation of the automatic stay contained in count I. All of Krystal's other claims against GM rest upon that violation.[8]

---

8. For reasons best known to GM and/or its attorneys, GM spends considerable time and energy in this appeal arguing that its violation of the automatic stay was not willful. *See* Appellee's Br. at 17-21. For

When Krystal filed its Amended Disclosure Statement, it knew about each of the claims it has now included in this action. However, as quoted above, the Amended Reorganization Plan and Amended Disclosure Statement merely referenced Krystal's position that the dealer agreements were part of the bankruptcy estate and the ongoing state proceedings wherein Krystal was attempting to undo GM's termination of them.

The Bankruptcy Court found that Krystal limited the reference to the instant claim in order to conceal the claims from creditors in the hope of retaining any recovery for itself. While Krystal concedes that the schedules and statements it initially filed with the Bankruptcy Court on October 24, 1995 "failed to specifically list as a potential asset of Debtor's estate any claims against General Motors or GMAC," Appellant's Br. at 14,and 21, it vigorously denies taking two irreconcilably inconsistent positions in this case.

Krystal argues that although it did not list the instant claim as an asset in the October 24, 1995, Amended Disclosure Statement, the language of that disclosure was nevertheless adequate to inform creditors of claims Krystal had against GM and therefore they knew of the contingent asset of a potential damage award.

Alternatively, Krystal argues that even if the disclosure

---

example, GM argues "In [*Krystal I*], this Court held that GM had violated the automatic stay, but did *not* reach the issue of whether GM's conduct also constituted a *willful* violation under § 362(h)." Br. at 17-8. (emphasis in original). GM obviously knows that we have already ruled that its attempt to terminate the franchise agreement was a violation of the automatic stay. We can not, and will not, revisit that issue here.

Moreover, although § 362(h) requires a "willful" violation as a condition precedent to recovering damages, we have noted that this does not mean that the creditor must intend to violate the stay. "It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *Landsdale Family Restaurants Inc. v. Weis Food Service*, 977 F.2d 826, 829 (3rd Cir. 1992) (internal citations and quotation marks omitted).

was insufficient, it could amend the disclosure statement under Bankruptcy Rule 1009 and thereby cure any inadequacy because the bankruptcy case is still open. Krystal insists that it did effectively amend the disclosure as soon as the Bankruptcy Court notified Krystal of the possible application of judicial estoppel.[9] Therefore, argues Krystal, it legitimately cured "any conceivable defect in a previously filed schedule or non-disclosure." The Bankruptcy Court was not impressed by Krystal's eleventh hour candor and neither are we.

As the Bankruptcy Court properly noted, the language in the Amended Disclosure Statement was "little more than boilerplate." It did not specify any of the claims contained in the instant complaint against GM, much less attempt to place any monetary value on them. We agree that such boilerplate language is simply not adequate to provide the level of notice required. The bankruptcy rules were clearly not intended to encourage this kind of inadequate and misleading disclosure by creating an escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of candor is discovered.

> Allowing [Krystal] to back-up, . . . and amend [its] bankruptcy filings, only after [its] omission has been [detected], suggests that a debtor should consider disclosing potential assets only if . . . caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the Bankruptcy Court with a truthful disclosure of the debtors' assets.

*Burnes v. Pemco Aeroples, Inc.*, 291 F.3d 1282, 1288 (11th Cir. 2002).

As noted above, judicial estoppel is properly applied only when appropriate to redress the problem the doctrine was

---

9. Krystal thereafter added the following amendment to Schedule B which asks disclosure of contingent and unliquidated claims:

> "Tort, contract and violation of automatic stay claims against General Motors Acceptance Corporation."

It also noted that it did not know the value of the claims.

designed to remedy. Krystal argues that the doctrine of judicial estoppel is too drastic a remedy to apply here because the "[p]lan calls for a one hundred (100%) percent payment to all creditors." Appellant's Br. at 22. However, as GM is quick to point out, full payment is contingent upon Krystal's ability to sell its GM franchises for some undetermined profit. *See* App. 95, and 104, Appellee's Br. at 13. Moreover, GM represents without contradiction that Krystal still has not paid its creditors in full, and that the Amended Plan noted the necessity of Krystal's owner ("Pappas") getting creditors to compromise their claims. According to GM, creditors may not have been willing to compromise their claims as much, if at all, had they known of the possible addition of damages from the instant law suit.

## C. Bad Faith

In *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416-18 (3d Cir. 1988), we concluded that a rebutable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose. That is precisely Krystal's situation here. Accordingly, the record is sufficient to support the Bankruptcy Court's finding of bad faith.

### 1. Krystal's Knowledge of the Assets

Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the Plan." 11 U.S.C. § 1125(a) (1). Debtors must therefore identify and disclose all "property of the estate" including all of the debtor's "legal and equitable" property interests. This includes such contingent assets as any cause of action Krystal may have against GM, and Krystal does not argue to the contrary. The nature of Krystal's purported misrepresentations here can fully be appreciated if we place them within the proper context.

"A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights." *Oneida*, 848 F.2d at 416. Therefore, "preparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor." *Id.* at 417. It has been called by one commentator, "the pivotal concept in reorganization of a Chapter 11 debtor." *Id.*

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.

*Oneida*, 848 F.2d at 417 (internal quotation marks omitted).

Krystal relies upon the history of this dispute in arguing that it did not have any claim to disclose until we ruled in *Krystal I*, that GM's termination of the franchise agreement violated the automatic stay. Until then, argues Krystal, the appropriate state agencies had ruled that GM properly terminated the franchise agreement and there was therefore no cause of action against GM to include in the disclosure statement of October 24, 1995. Therefore, according to Krystal, when the Bankruptcy Court confirmed the Plan in October of 1997, the "law of the case" was that (1) Krystal had no ownership interest in the dealership franchise and (2) GM had not violated the automatic stay provisions of the Bankruptcy Code. Therefore, there was no cause of action to disclose. Appellant's Br. at 21.

However, Krystal was aware of every allegation currently asserted in Counts II through VII of its complaint when it filed its Statement and Plan. Each of the events alleged in those counts had already occurred when Krystal made the applicable filings under the Bankruptcy Code. Moreover, Krystal's argument that it could not know that GM violated the automatic stay as it alleges in Count I, is also unpersuasive. Krystal clearly knew of this potential claim because it vigorously argued that GM violated the automatic stay when it appeared before us in *Krystal I.*

Although it is true that the relevant state agencies had upheld GM's right to terminate the lease, the agencies were never asked to consider the issue of Krystal's alleged violation of the automatic stay, and Krystal knew this when it filed its disclosure statement in the Bankruptcy Court on October 24, 1995. The Vehicle Board's Adjudication and Order did not reach this issue, and the Commonwealth Court's November 6, 1995 decision had not yet been filed. Therefore the "law of the case" did not negate Krystal's duty to disclose its claims against GM.

Krystal's attempt to seek refuge in the law of the case doctrine ignores the scope of the disclosure requirement as well as the precise issues before the Vehicle Board and Commonwealth Court. The Code requires that a debtor list *potential* causes of action, not claims it actually intends to sue on at the time of the required disclosure. "It has been held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context." *Oneida*, 848 F. 2d at 416. Thus, Krystal's own actions belie its contention that it did not know it had a potential claim against GM. Krystal has consistently and vigorously maintained that GM's termination of the franchise agreement violated the automatic stay. That claim was not within the purview of the proceeding Krystal brought before the Vehicle Board or Commonwealth Court, and the record belies any argument that it was not then within Krystal's contemplation. To the contrary, it appears that Krystal continuously believed that GM had violated the automatic stay. Nothing here supports Krystal's current position that it had to await a court decision to disclose this potential claim. Moreover, Krystal ignores the rather damning fact that it included the franchise as an asset of the estate in its disclosure statement even though the Vehicle Board had already upheld GM's termination of it. App. at 142.

Although we do not require debtors to list hypothetical claims that are so tenuous as to be fanciful, we do require them to advise creditors of the kind of potential claims that Krystal is asserting here. "[C]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, [therefore] the importance of full and honest disclosure cannot be overstated." *Ryan*, 81 F.3d at 362.

The Bankruptcy Court properly concluded that Krystal had enough information prior to confirmation to know it might have a claim against GM. " '[I]f the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action, then that is a 'known' cause of action such that it must be disclosed.' " *In re Coastal Plains,* 179 F.3d 197, 208 (5th Cir. 1999) *(citations omitted).* It is difficult to understand why Krystal would list the franchise as an asset after the administrative rulings upholding GM's termination of it and yet fail to disclose a potential suit against GM for what Krystal has always argued was an improper and ineffective cancellation other than an intent to hide the claim from creditors.

## 2. Krystal's Motive to Conceal the Claims

The Bankruptcy Court found that (1) Krystal's owner ("Pappas") agreed to contribute substantial funds toward the payment of claims and expenses associated with Krystal's reorganization and (2) the owner was also engaged in negotiating unsecured claims downward to minimize the amount Pappas would have to pay.[10] Krystal therefore had every reason to minimize its assets so that creditors would conclude they had no choice but to significantly compromise their claims and approve Krystal's reorganization. Indeed, the argument that Krystal made in support of its planned reorganization confirms this. The liquidation analysis Krystal set forth in its Disclosure Statement provides as follows:

> [S]ecured and priority claims far exceed the value of the Debtor's assets. This means that in the event of a liquidation no unsecured creditor will receive any dividend. In fact, it is most likely that in the event of a Chapter 7 liquidation secured and priority claims will not be paid in full.
>
> Although Debtor's proposed Plan actually amounts to a liquidation of all Debtor's assets, it is nevertheless asserted that all creditors will still be treated much better under the Plan than under a Chapter 7

---

10. GMAC's $114,486 claim was negotiated down to $23,000. App. 12.

> liquidation. This is because the Plan provides for substantial cash payments to almost all creditors.
>
> The reason Debtor can propose cash payments under the Plan, and none can be expected under a Chapter 7 liquidation, is because Mr. Pappas is willing to contribute substantial cash toward the payment of claims and expenses associated with this reorganization.

App. 27. Against this background, it is undeniable that creditors should have been informed of this contingent asset.

### 3. Harm To Creditors

Judicial estoppel is only appropriate when the inconsistent positions are "tantamount to a knowing misrepresentation to or even fraud on the court." *Total Petroleum, Inc. v. Davis,* 822 F.2d 634-38 (8th Cir. 1987). Not surprisingly, Krystal reminds us of this, as well as the fact that the doctrine is to be used sparingly and reserved for the most egregious case. According to Krystal, employing that doctrine and the sanction of dismissal here was "overkill," even if the doctrine is otherwise appropriate.

This position is based upon Krystal's assertion that under the Plan, (1) the secured creditors receive 100% payment; (2) unsecured creditors received 75% and stand to receive full payment upon the sale of the franchise; and (3) the legal claims are contingent assets of a highly speculative nature and therefore would have been valued at zero dollars even if disclosed. Krystal concludes that since the creditors experienced no financial harm, the court erred by finding that there was bad faith.

In making this argument, Krystal compares itself to the debtor in *Ryan.* There, we held that a Chapter 11 debtor-builder's failure to disclose causes of action against suppliers of allegedly defective wood trim in bankruptcy proceedings did not bar debtor from pursuing those claims outside of bankruptcy. Although the contingent assets represented by those claims were not disclosed in the bankruptcy proceedings, we rejected the Bankruptcy

Court's application of judicial estoppel because the debtor did not attempt to "play fast and loose" with the court.

We also held that the application of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court. We concluded that the presence or absence of any such benefit is merely a factor in determining whether the evidence would support a conclusion of bad faith. After raising the issue of whether Ryan actually received a benefit from the omissions there, we stated: "We readily conclude that the doctrine of judicial estoppel in this circuit contains no such requirement." 81 F.3d at 361. We then explained:

> the critical issue is what the [party] contended in the underlying proceeding, rather than what the jury found. Whether the party sought to be estopped benefitted from its earlier position or was motivated to seek such a benefit may be relevant insofar as it evidences an intent to play fast and loose with the courts. It is not, however, an independent requirement for application of the doctrine of judicial estoppel.

*Id.* (Internal citations and quotation marks omitted).

The totality of the circumstances in *Ryan* lead us to conclude that the debtor did not omit any information in bad faith. Ryan omitted certain assets from its disclosures, but it also omitted counterbalancing liabilities. Therefore, largely the "balance of assets and liabilities . . . may have been unaffected by the failure to list [certain] claims as assets." 81 F.3d at 363. Ryan did not benefit from the omission.[11] Despite Krystal's argument to the contrary, that is not the situation here.

The Bankruptcy Court could not accept Krystal's argument that its creditors were not harmed, and neither can we. The Bankruptcy Court also reasoned that the

---

11. Because, as we have noted, the estopped party need not have benefitted from the misrepresentation, we note the absence of a benefit in *Ryan* only because it was relevant to an inquiry into that debtor's bad faith. For the same reason, we note that Krystal benefitted from the omission here. At the very least, the record certainly supports the Bankruptcy Court's finding that it tried to derive such a benefit.

impact of this nondisclosure must be measured in more than monetary terms. Such nondisclosures affect creditors' willingness to negotiate their claims and enhance the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is. That is particularly important here because, as noted above, Krystal's owner negotiated very substantial compromises of claims against Krystal.

### 4. Lesser Sanctions

The fact that a sanction is to be used sparingly does not mean that it is not to be used when appropriate. Applying a lesser sanction here (such as requiring Krystal to pay unsecured creditors the balance of their claims out of any damages Krystal might recover from the instant action) would reward Krystal for what appears to be duplicitous conduct in the course of its bankruptcy proceeding. Krystal would still reap the benefit of any recovery beyond the amount paid to satisfy outstanding debts. In addition, the integrity of both the bankruptcy process and the judicial process would suffer. In short, allowing Krystal the lesser sanction it advocates would send a message that "a debtor should consider disclosing potential assets only if he is caught concealing them." *Pemco*, 291 F.3d at 1288. The Bankruptcy Court was understandably reluctant to allow Krystal to use sleight of hand to show its cards to its creditors and so are we. Dismissal is necessary to prevent Krystal from profiting from its omission. It is also "required to preserve the integrity of the earlier proceedings." *Oneida*, 848 F.2d at 418.

### 5. Opportunity to Explain

Lastly, Krystal argues that the Bankruptcy Court's finding of bad faith is undermined by the absence of any testimony on this issue. It maintains that it never had an adequate opportunity to explain. However, "[w]e have held that a District Court need not always conduct an evidentiary hearing before finding the existence of bad faith for judicial estoppel purposes." *Montrose Medical Group*, 243. F.3d at 780 n.5.

In *Oneida,* we held that if the pleadings show (1) the fact of non-disclosure of the asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad faith. Although the Bankruptcy Court here raised the issue of judicial estoppel *sua sponte,* the court gave Krystal the opportunity to fully brief this issue and gave both parties the opportunity for oral argument. We conclude that Krystal had a fair opportunity to argue that the doctrine did not apply and to ask the Bankruptcy Court not to dismiss its complaint. We find no error in the Bankruptcy Court's ruling, and we conclude that the District Court properly affirmed it.

## III. CONCLUSION

For all of the above reasons, the judgment of the District Court will be affirmed.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*