**In re Sandra T. LIGHTFOOT, Debtor(s).**

**Sandra T. Lightfoot, Plaintiff**

v.

**Jerry Borkon t/a Borkon Truckarama, Defendant.**

**Bankruptcy No. 07–15631 SR.
Adversary No. 07–362.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 8, 2008.

144

Ronald G. McNeil, Esquire, McNeil Legal Services, Philadelphia PA, for Plaintiff.

Ellen M. McDowell, Esquire, McDowell Riga PC, Maple Shade, NJ, George Conway, Esquire, Office of the United States Trustee, Philadelphia PA, for Defendant.

## OPINION

STEPHEN RASLAVICH, Chief Judge.

### Introduction.

Before the Court is the Debtor/Plaintiff's Complaint Seeking Damages for Violation of the Automatic Stay. The Motion is opposed by the Defendant, Jerry Borkon. After hearing held July 29, 2008, briefs were submitted and the Court took the matter under advisement. For the reasons set forth below, judgment will be entered in favor of Plaintiff and against the Defendant in the amount of $1,000.

### Factual Background

The Debtor and her husband operated an unincorporated hauling business known as Double SS Trucking. Over an eighteen month period starting in January 2006, they acquired a fleet of five trucks from Jerry Borkon, d.b.a. Borkon Truckarama.[1] Borkon provided the financing for the purchases. As of July 2007, the Debtor and her husband had defaulted on the truck loans. Efforts toward working out the defaults were unavailing and in September 2007 Borkon repossessed two of the trucks. Because the Debtor's hus-

---

1. Mr. Borkon is the sole proprietor of the business. *See* Joint PreTrial Statement, II A.

band had been in Chapter 13 bankruptcy for over one year, Borkon sought relief from the automatic stay. On the day after Borkon obtained relief in her husband's bankruptcy, the Debtor herself filed a bankruptcy case. Two days later, Borkon repossessed two of the five trucks; to wit: two model year 2000 Freightliners.[2] *See* Complaint and Answer ¶ 21. On October 19, the parties entered into a consent order in the Debtor's bankruptcy case which conditioned continuation of the stay as to the remaining three trucks. *See* D–11.[3] The consent order was silent as to the two 2000 Freightliners which Borkon had kept. On October 27, the Debtor filed this adversary proceeding alleging violations of the automatic stay based on the repossession of those two trucks.

*Applicable Law*

■ The automatic stay under § 362(a) of the Bankruptcy Code arises upon the filing of a bankruptcy petition. 11 U.S.C. § 362; *In re Hardy*, 39 B.R. 64, 65 (Bankr.E.D.Pa.1984). The stay " 'is one of the fundamental debtor protections provided by the bankruptcy laws.' " *H & H Beverage Distributors v. Dep't of Revenue*, 850 F.2d 165, 166 (3d Cir.1988) (quoting H.R.Rep. No. 595 at 340 (1977), *reprinted* in 1978 U.S.C.C.A.N. 5787, 6296). It "is designed to effect an immediate freeze of the *status quo* ... and protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir.1993) (citing *Interstate Commerce Comm'n v. Holmes Transp., Inc.*, 931 F.2d 984, 987 (1st Cir.1991), *vacated*, 983 F.2d 1122 (1st Cir.1993) and *Treasurer of*

*Snohomish Cty., Wash. v. Seattle First Nat'l Bank (In re Glasply Marine Indus.)*, 971 F.2d 391, 394–95 (9th Cir.1992)); *see also In re University Medical Center*, 973 F.2d at 1084. To provide the bankruptcy process with an opportunity "to resolve competing economic interests in an orderly and effective way," the automatic stay is designed to: (1) effectively stop all creditor collection efforts; (2) stop all harassment of a debtor seeking relief, and (3) maintain the status quo between the debtor and creditors. *Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir.1999) (citation omitted). *The Stay as it Relates to Property of the Estate*

■ The automatic stay applies, *inter alia*, to "any act to obtain possession of property of the estate ..." 11 U.S.C. § 362(a)(3). Upon filing a bankruptcy petition, an estate is created. 11 U.S.C. § 541(a)(1). The estate contains "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id*. A debtor's interest in property is defined by state law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136. Borkon contends that because the Debtor had no interest in the two trucks which were repossessed, the trucks are not property of her bankruptcy estate. As proof, he relies almost entirely on the fact that the Debtor's name is not on the title of either vehicle. T–63, 68. This, however, does not conclusively establish whether the two trucks were part of the bankruptcy estate.

■ In Pennsylvania, a certificate of title is prima facie evidence of the facts appearing on the certificate. *See* 75 Pa. C.S. § 1106(c). This places the burden of proof upon a claimant to prove some own-

---

2. The parties dispute when—exactly—Borkon was apprised of the Debtor's filing.

3. The trucks have since been resold. T–31.

ership interest in the vehicle, notwithstanding the absence of the Claimant's name on the title. A certificate of title does not constitute more than some evidence of the ownership of a motor vehicle. *Semple v. State Farm Mut. Auto. Ins. Co.*, 215 F.Supp. 645 (E.D.Pa.1963). It creates a presumption that may be rebutted by other evidence. *Hadid v. Budget Rent–A– Car*, 22 Pa. D & C.3d 349, 354 (Lehigh Cty. Common Pleas 1982) ("It is well settled that the certificate of title is not conclusive evidence of ownership of a motor vehicle"). It appears that Borkon anticipated the Debtor would make this very argument. He cites a line of cases wherein a claimant successfully asserted ownership of a vehicle titled in someone else's name. He then attempts to distinguish those cases from the instant case. Where those reported decisions involved other evidence *of ownership or donative intent*, he argues, this record is devoid of such proof. *See* Defendant's Post–Trial Brief, 3–6. His point here is well made.

■ While the Debtor asserts an ownership interest in all five trucks (T–34), the legal basis for the claim is unclear. At one point, she stated that Borkon required her signature as a guarantor of her husband's obligations. T–32–33. At another she contends that as an owner of the business [4] for which the trucks were purchased, she was required to sign the repayment Agreement drafted by Borkon. T–34, 49. Whichever it was, neither necessarily indicates an ownership interest. Guarantor status does not imply ownership; a guarantee is a contract, a collateral agreement for performance of another's undertaking. *See Stevenson Funeral Home v. Kraynok*,

53 Pa. D. & C.2d 256, 1971 WL 14265 *1 n. 2 (1971) (citing Black's Law Dictionary for definition of guarantee). Likewise, if the Debtor signed an agreement on behalf of the Double SS Trucking partnership,[5] that does not make the trucks her property. They would belong to the partnership. *See* 15 Pa.C.S. § 8313 (defining partnership property). For these reasons, the Court does not find the Debtor to have overcome the presumption that she had no interest in the two vehicles. Hence they were never property of *her* bankruptcy estate.

*The Stay as it Relates to Collection Activity*

■ But proceeding against estate property is not the only way by which the Debtor maintains that the Defendant violated the bankruptcy stay. In the Complaint, it is alleged that the recovery and sale of the trucks constituted impermissible acts to collect a prepetition debt. Complaint, ¶ 28. The automatic stay unquestionably applies also to "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). As stated in the legislative history of § 362, "the stay: ... gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits a debtor to attempt a repayment or reorganization plan, or simply be relieved of the financial pressures that drove him into bankruptcy." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6296–97. The focus, in other words, is not on estate preservation, but rather allowing

---

4. *See* Schedule B, listing her interest in SS Trucking, Inc. [*sic* ]

5. Although her schedules characterize the business as a corporation, the parties have stipulated that it is a partnership. *See* Joint PreTrial Statement ¶ II. This is confirmed by their having registered a fictitious name (T–33).

the debtor a respite from the sometimes oppressive weight of debt collection. Borkon strenuously maintains that this line of argument is inapposite because the Debtor had no contractual liability for the two trucks he sold;[6] and, thus, the repossession and sale were not acts to collect a debt of the Debtor. The weight of the evidence does not support this premise.

As might be expected, the Debtor herself insists that she was liable for the debt relative to the trucks in question. T-33 Because her testimony—as well as the Defendant's—is self-serving on the point, the documentary evidence, such as it is, becomes particularly important. Although this part of the record could be clearer, there is enough to piece together the parties' history and to make a finding on the essential question. The Court begins with the certificate of title for the 1996 Freightliner. D-3. The title to that truck was issued in April 2006 and lists both the Debtor's husband and the Debtor as registered owners. Next comes the title to the 1998 Kenworth truck. D-4. That Certificate of Title was issued in December 2006 and is likewise registered in the name of husband and wife. On June 27, 2007, the Defendant drafted a handwritten instrument on what appears to be his business stationery. It is titled "Agreement between Borkon Truckarama and Double S Trucking, Shawn Hamiel and Sandra Hamiel." See Ex. D-9. It references payments due on a Yellow Tractor (identified as one of the two 2000 Freightliners, T-6), a Maroon Tractor (another 2000 Freightliner, T-8, 50-51) as well as "(2) Original Tractors."[7] Id. Both the Debtor and her husband signed this document. Certificates of title were issued for both 2000 Freightliners naming only the Debtor's husband as reg-

istered owner. See D-1, D-2. On July 17, the Defendant wrote a letter addressed to both "Shawn and Sandra Hamiel" informing them that they were in default. See Ex. D-12. One month later, the fifth truck (a 2001 Freightliner) was transferred and the title to that vehicle was registered under the name of the couple's business. See D-5. On September 6, Defendant wrote another letter addressed to "Sandra and Shawn Hamiel." This letter purports to memorialize the previous day's conversation regarding arrearages on the trucks and other related issues. See D-10 The question is whether all of this establishes that the Debtor was liable to Defendant for the payment of the debt on the entire fleet of trucks.

Borkon says no, insisting that he was not in privity with the Debtor as to the repossessed trucks. T-7. He maintains that the writings of June 27, July 17, and September 6, served only to give an "overview" of the entire arrangement between the parties. T-5 That arrangement, he goes on, limited the Debtor's involvement to the three vehicles which he did not repossess: i.e., the 1996 Freightliner, the 1998 Kenworth and the 2001 Freightliner. T-8, 10, 26. The Debtor sees it differently, and stresses that the writings in question nowhere limit her liability to certain trucks. T-7.

The record supports the Debtor on this point. The first two trucks which the Debtor and her husband purchased were titled in both of their names. On June 27, after he sold them another two trucks, Borkon decided to memorialize their agreement. D-9 But that writing nowhere limits the Debtor's liability to fewer than

6. T-4.

7. Because the 1996 Freightliner and the 1998 Kenworth were the only trucks heretofore

sold to the Debtor and her husband, they are the "original two tractors." T-6.

all of the trucks. The Debtor and her husband are named in the heading of the agreement, and her signature appears at the bottom along with his. The Court finds this to evidence a course of dealing between the Debtor and Defendant, whereby she would be liable for all of the debt, just as her husband. *See Westinghouse Electric Co. v. Murphy, Inc.*, 425 Pa. 166, 171–72, 228 A.2d 656 (1967) ("... if evidence of the contract is not an integrated document, and, moreover, one partly or wholly composed of oral communications, ... courts must look to surrounding circumstances and the course of dealings between the parties ... to ascertain the intention of the parties.")[8] Intuitively, of course it stands to reason that Borkon would prefer to obligate as many persons as he could for payment of the entire fleet. And the Court finds this to be the most reasonable inference to draw of the record: i.e., that the Debtor was asked to and agreed to be obligated for the payment of all five trucks. More to the point, this makes the Defendant's act of repossessing the two trucks an impermissible act to collect a prepetition debt, and a violation of the automatic stay.

*Is the Violation Actionable?*

■ Having determined that there has been a violation of the stay, the next question becomes the consequences which flow from it. Section 362(k) provides:

(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k)(1). The provisions of the statute thus come into effect upon the Debtor showing that: (1) a violation of the automatic stay has occurred; (2) the violation was willful; and (3) the willful violation has caused injury to the debtors. *In re Wingard*, 382 B.R. 892, 900 (Bankr. W.D.Pa.2008)

*Willfulness*

■ Violation of the stay occurred when the Defendant repossessed the trucks postpetition. "Willful" conduct has been defined as deliberate or intentional conduct. *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 485 (E.D.Pa.1989). Conduct which violates the automatic stay is "willful" if a party acts with knowledge that a bankruptcy petition has been filed. *In re Lansdale Family Restaurants, Inc.*, 977 F.2d 826, 829 (3d Cir.1992) (citing *In re University Medical Center*, 973 F.2d at 1087–88). A "willful violation" does not require a finding of specific intent to violate the automatic stay. *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 320 n. 8 (3d Cir.2003); *In re Atlantic Business & Community Corp.*, 901 F.2d 325, 329 (3d Cir. 1990) (citing *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989)). Rather, an action is willful if the respondent/defendant knew of

---

8. As an aside, even assuming, for argument purposes that the writings in question are vague, the writings were drafted by the Defendant. Principles of contract construction accordingly require the Court to give the Debtor the benefit of any doubt. *See In re Eastern Continuous Forms, Inc.*, 302 B.R. 320, 337 (Bankr.E.D.Pa.2003) (explaining that where language in a written document is ambiguous or its meaning doubtful then, in determining the intention of the parties, the writing must be construed most strongly against the party drafting it). Similarly, where multiple writings are not integrated, other evidence may be considered to determine what the parties intended. *See Mellon Bank v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1010 n. 9 (3d Cir.1980) (explaining that where the written contract is ambiguous the Parole Evidence Rule does not prevent the use of extrinsic evidence to interpret the writing).

the automatic stay and the conduct that violated the automatic stay was intentional. *Krystal Cadillac, supra, id.; In re Atlantic Business and Community Corp.,* 901 F.2d 325 (3d Cir.1990) Borkon's testimony is that he decided to retain and sell the two 2000 Freightliner trucks despite the Bankruptcy because they were not property of the bankruptcy estate. T–28, 29. While that is true, based on this admission the Court concludes that the Defendant acted willfully.

*Good Faith and Willfulness*

▆ The Defendant maintains that there can be no finding of willfulness where there is a bona fide question of law regarding the applicability of the stay. Defendant's Brief, 9. Although he does not specifically say as much, Defendant appears to be alluding to a limited exception to the general willfulness standard. The Third Circuit has recognized such an exception "if a creditor's action was based on persuasive legal authority indicating that their conduct did not violate the stay and that the law was unsettled." *See In re University Medical Center,* 973 F.2d 1065, 1088 (1992). Since that decision, however, there have been substantial revisions to the Bankruptcy Code. Among the changes is an addition to former § 362(h) which has now become § 362(k). The change recognized that a good faith exception to a stay violation existed but only under a limited set of circumstances. In a recent case, Judge Frank of this Court analyzed the effect of the new law on *University Medical Center.* Judge Frank concluded that *University Medical Center* was legislatively overruled by the BAPCPA and his analysis is worth quoting at length:

> When *University Medical Center* was decided, there was no express, statutory good faith exception to liability for intentional actions taken in violation of the automatic stay with knowledge of

the bankruptcy case set forth in then § 362(h). As a result, *University Medical Center* can be considered as a judicial gloss on the text of the pre-BAPCPA Code, designed to effectuate a Congressional intent that conduct with a certain type of scienter (i.e., good faith) should not be subject to the damages remedy provided in § 362(h) (now § 362(k)).

In enacting BAPCPA, Congress modified the Code provision addressed in *University Medical Center* and expressly addressed the issue of good faith. In doing so, Congress provided for only a limited, statutory good faith exception to the § 362(k) damage remedy. The express, statutory good faith exception is more limited than the one expressed in *University Medical Center* in two distinct ways: (1) the limitation applies only to good faith violations of § 362(h), which relates only to action taken in the good faith belief that the automatic stay has terminated because a debtor fails to perform his or her obligations under § 521(a)(2) in a timely manner; and (2) it precludes only the imposition of punitive damages and in no situation restricts the imposition of "actual damages" for willful violations of the automatic stay.

With Congress having addressed the issue of a good faith exception to § 362(k) liability expressly through the BAPCPA, the plain language of § 362(k)'s exception does not encompass other types of arguably good faith conduct that Congress could have chosen to exempt from liability. Given this carefully constructed exception drawn by Congress, I conclude that *University Medical Center* is inconsistent with § 362(k), insofar as the case held that a party is not subject to actual damages for voluntary acts taken with knowledge of the bankruptcy case

in violation of the automatic stay when a party relies upon "persuasive legal authority" and the law on the issue is sufficiently unsettled.

*In re Mu'min,* 374 B.R. 149, 168–169 (Bankr.E.D.Pa.2007) The Court finds this reasoning to be persuasive and will adopt it here. Because this conduct at issue here does not involve a statement of intention under § 521, alleged good faith on the Defendant's part is irrelevant.

*Actual Damages*

■■■■ That leaves the question of the damages, if any, which were sustained as a result of the stay violation. Defendant submits that the Debtor failed to establish that she suffered any resulting damages. The Defendant is correct. While there was oral testimony as to the loss of certain contracts because of the repossession, it was never quantified. There was no evidence, for instance, of a written contract, neither was their discrete proof of what that contract might have netted after expenses.

The Debtor's testimony was that because the two trucks were repossessed, her company lost business from a customer known as Olympia Steel and ultimately folded. T–38 As to what this contract might have been worth, however, the Debtor merely speculated that it might be $625,000. T–40. No contract or invoices were produced. Neither could the Debtor give an accurate sense of the company's cost of operations. She simply guessed that her overhead was about $300,000. T–47 In sum, there is simply no credible evidence from which to conclude that the Debtor suffered some *quantifiable* harm

as a result of Defendant's violation of the Bankruptcy stay.

*Punitive Damages*

■■■■ Turning from the question of actual damages to sanctions, the Court observes that it has discretion to impose punitive damages in "appropriate circumstances." [9] *Solfanelli v. Corestates Bank, N.A.,* 203 F.3d 197, 203 (3d Cir.2003) The decision requires the Court to consider (1) the nature of the respondent's conduct; (2) the respondent's ability to pay; (3) the respondent's motives; and (4) any provocation by the debtor. *In re B. Cohen & Sons Caterers, Inc.,* 108 B.R. 482, 487 (E.D.Pa. 1989), *reconsideration denied,* 1991 WL 17874 (E.D.Pa. Feb.13, 1991), *aff'd,* 944 F.2d 896 (3d Cir.1991); *In re Wagner,* 74 B.R. 898, 905 (Bankr.E.D.Pa.1987). Such awards are a response to particularly egregious conduct and are, according to the Third Circuit Court, "reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Cochetti v. Desmond,* 572 F.2d 102, 106 (3d Cir.1978).

■■■■ The Court finds the Defendant's conduct to implicate the circumstances for which an exemplary award of damages is reserved. The Defendant's conduct is certainly more than a bare or technical violation of the bankruptcy stay. Despite knowledge of this bankruptcy, the Defendant sold collateral which secured an obligation of the Debtor. Defendant contends that the Debtor was not indebted to him as to that collateral but, as discussed above, the evidence supports a contrary finding. The Defendant's actions do not appear to

9. Defendant argues that once a court finds no actual damages, that thereby precludes an award of punitive damages. *See* Defendant's Brief, 11. That argument is based, however, on "persuasive" authority, i.e., case law out- side this circuit. There is no Third Circuit authority conditioning the imposition of punitive damage upon a finding that actual harm was suffered.

have been an accident or the result of inadvertence.

It was logical for the Defendant to obtain the liability of both husband and wife on all of the trucks sold, and the Court has concluded he did so. As to whose name would be on which titles, it may be—just as Defendant testified—that he left that up to the Debtor's husband.[10] T–60–62. But after they defaulted, and after he had to obtain stay relief in the husband's bankruptcy, only to have the Debtor file bankruptcy the next day, the question of whose name was on which certificate of title became very important to the Defendant. He elected to act on the premise that, because the Debtor's name wasn't on a title, the automatic stay simply did not apply. T–28, 29. As discussed, this reasoning fails.

The Defendant's tone and demeanor at the July 29, 2008 hearing reflected anger and a palpable sense of frustration. His sarcastic use of the words "cute" and "sweet" to describe the Debtor's decision to file bankruptcy when she did suggests that he felt duped by the Debtor and her husband. He recalls "terrible delays in payment and lies" on their part. T–28. The Defendant's patience was exhausted and he apparently wanted quick vindication.

That does not excuse flouting the law. The Debtor was within her rights to have filed bankruptcy when she did. The Defendant might have quickly pursued modification of the bankruptcy stay as to the two trucks he repossessed. By Defendant's own assessment, the Debtor would not have survived a motion for stay relief. Defendant's Brief, 8. She and her husband were in arrears and the trucks were not insured as required. Rather than seeking relief, the Defendant took matters into his own hands by keeping and selling the two trucks he had already repossessed. His conduct demonstrates a disregard for the law which the Court cannot countenance. The Court finds that a modest monetary sanction of $1,000.00 is warranted under the circumstances.

*UDAP*

The Debtor's remaining cause of action[11] is her claim under the Unfair Trade Practices and Consumer Protection Law[12] (UDAP). Specifically, it is alleged that "Defendant's tactics are fraudulent and or deceptive and were done to create the likelihood of confusion or misunderstanding." Complaint, ¶ 41.

In order to succeed in her claim under UDAP, the debtor must meet three criteria. First, the debtor must show that the Defendant's business (that is, the sale of trucks on a secured basis) constitutes a "trade" or "commerce" within the act, 73 P.S. § 201–3. Second, she must show that the act grants her a private cause of action

---

**10.** The Debtor's husband did not appear at trial or otherwise testify.

**11.** The complaint originally pleaded a violation of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692; however, it is not listed among the legal issues presented in the Joint PreTrial Statement so it appears to have been waived. *See In re Williams*, 291 B.R. 636, 641 n. 11 (Bankr.E.D.Pa.2003) (noting that Joint PreTrial Statement supersedes pleadings) Regardless, no cause of action under the FDCPA applies inasmuch as that law applies only to consumer debts. *See* 15

U.S.C. § 1692a(5). There is no dispute that the purchase of the trucks by the Debtor and her husband were for their business. The Debtor, therefore, lacked standing to raise that claim.

**12.** 73 P.S. § 201–1 et seq. Like most American jurisdictions, Pennsylvania has enacted a statute which is generically known as a law prohibiting and punishing "unfair or deceptive acts and practices," i.e., a UDAP statute, specifically the Unfair Trade Practices and Consumer Protection law, 73 P.S. § 201–1, et seq. (referred to hereafter as "UDAP").

for injuries sustained from the loan. 73 P.S. § 201–9.2. Third, the debtor must demonstrate that the actions of which she complains are either unfair or deceptive and fall within one of the 21 specific acts enumerated by § 201–2, which are declared unlawful by § 201–3. *See In re Smith,* 866 F.2d 576, 581 (3d Cir.1989).

The Court finds that the Debtor cannot succeed under her UDAP claim because she lacks a private right of action. The statute pertains to the purchase of goods or services primarily for personal, family or household purposes. 73 P.S. § 201–9.2. These purchases were made in the course of the business of the Debtor and her husband. *See Waldo v. North American Van Lines, Inc.,* 669 F.Supp. 722 (W.D.Pa. 1987) (holding that truck driver purchased tractor and insurance coverage from trucking company solely for use in his trucking business and thus was not "consumer" and could not bring suit against trucking company for violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law) They cannot be characterized as "consumer" purchases. Her UDAP claim fails, therefore, for a lack of standing.

*Summary*

The Court finds that the Debtor has willfully violated the bankruptcy stay. For the reasons stated, judgement shall be entered in favor of Debtor and against the Defendant in the amount of $1,000.00. The Debtor's state law consumer protection claim is denied.

An appropriate Order follows

### ORDER

AND Now, upon consideration of the Debtor's Complaint Seeking Damages for Violation of the Automatic Stay, the Answer in Opposition filed by the Defendant, Jerry Borkon, thereto, and after trial held July 29, 2008, it is hereby:

ORDERED, that for the reasons set forth in the attached Opinion, judgment shall be and hereby is entered in favor of Plaintiff and against the Defendant in the amount of $1,000.