Michael J. **ROBSON** and Linda S. Robson, Appellants–Plaintiffs,

v.

**TEXAS EASTERN CORPORATION; Texas Products Pipeline Company; Teppco Partners, L.P.; TE Products Pipeline Company, Limited Partnership; Texas Eastern Transmission Corporation; Panhandle Eastern Corporation d/b/a Panenergy Corp.; Crown Central Petroleum Corporation; LaGloria Oil and Gas Company; Kenneth Gillaspy; and Leonard Bruce, Appellees–Defendants.**

No. 36A01–0407–CV–292.

Court of Appeals of Indiana.

Aug. 15, 2005.

Transfer Denied Nov. 22, 2005.

Roger L. Pardieck, The Pardieck Law Firm, Seymour, Keith Guthrie, Elizabethtown, for Appellants.

Max W. Hittle, Jr., Anthony W. Mommer, Krieg DeVault LLP, Indianapolis, for Appellees.

## OPINION

MATHIAS, Judge.

Michael and Linda Robson's ("the Robsons") personal injury claims against Texas Eastern Corporation, et al ("TEC") were dismissed pursuant to TEC's Motion for Summary Judgment in Jackson Circuit Court. The Robsons appeal, raising the following restated issues for review:

I. Whether the Robsons' personal injury claims are barred by the doctrine of judicial estoppel; and,

II. Whether the Robsons have standing to pursue their personal injury claims.

Concluding that (1) the application of the doctrine of judicial estoppel or the doctrine of standing to the facts and circumstances of this case would expand either doctrine beyond the boundaries recognized by any case cited by TEC or found pursuant to this court's independent research and (2)

inferences from the undisputed facts of this case do not support the application of either doctrine, we reverse and remand to the trial court.

### Facts and Procedural History

Between April 1993 and October 1999, the Robsons and their children resided at 10963 East County Road 975 North, Seymour, Indiana. The Robsons' residence was directly south of the La Gloria petroleum truck loading facility, which is owned and operated by Crown Central Petroleum Corporation.

In late summer 1999, the Robsons were allegedly advised to leave their home as soon as possible because noxious contaminants were leaking from the La Gloria facility and were the cause of the Robsons' and other nearby residents' illnesses. Appellants' App. pp. 14–25, 415–16.

On August 25, 1999, the Robsons filed for federal bankruptcy protection under Chapter 13 of the United States Bankruptcy Code. On the following day, the Robsons' attorney sent their two largest creditors, Firstar Home Mortgage ("Firstar") and Republic Bank ("Republic"), a letter that stated in part:

I represent the Robsons in connection with a claim for personal injury and property damage against Texas Eastern Corporation and Crown Petroleum Corporation, which will be the subject of a lawsuit in the near future. The companies have operated a fuel truck loading facility immediately across the road from the Robson home for a number of years. As a result of health problems associated with exposure to emissions of toxic vapors from that facility, the Robsons have been advised to vacate their house as soon as possible. Given the known air pollution and underground contamination, it is quite likely that there is no market for the Robson prop-

erty. For this reason, one count of Mr. and Mrs. Robson's claim will seek compensation for the loss of the fair market value of the house.

\* \* \*

The Robsons cannot afford to keep up the payments and at the same time pay the costs of relocating their family. They would like to avoid accrual of late fees and interest charges pending resolution of their claim.

Appellants' App. pp. 391–92.

Pursuant to their Chapter 13 filing, the Robsons completed a schedule that listed their assets, including their claim against TEC. This schedule stated in part:

Mike and Linda Robson vs. Crown Oil Co.

Pollution lawsuit for environmental damages *to debtors' residential property*. Appellants' App. p. 150 (emphasis added). No creditor party to the Robson bankruptcy ever requested a copy of this schedule. Appellants' App. p. 381.

On September 1, 1999, the Robsons filed a complaint against TEC for personal injury and property damage. Appellants' App. pp. 14–26. The Robsons' complaint also alleged injuries to their children as a result of exposure to noxious contaminants. *Id.*

A Chapter 13 creditors meeting was held on October 21, 1999. This meeting was attended by the Robsons, their attorney, United States Bankruptcy Trustee Joseph Black, Jr. ("Black"), and Senior Accounting Clerk Natalie Jordan. None of the Robsons' creditors attended this meeting. Appellants' App. p. 378.

The notes taken from this meeting indicate that the Robsons' personal injury claims against TEC were discussed, and Black was specifically aware of the Robsons' personal injury claims. Appellants' App. pp. 378–79.

In formulating the Robsons' Chapter 13 bankruptcy plan, Black determined that it was in the best interest of the Robsons' creditors to waive "any interest the estate had in independently controlling the Robsons' litigation against TEC on behalf of the bankruptcy estate because of the likely time and expense involved in its pursuit." Appellants' App. pp. 401–02. On October 28, 1999, the bankruptcy court issued its order confirming the Robsons' Chapter 13 plan.

In conformance with the Robsons' Chapter 13 plan, the Bankruptcy Trustees Office prepared a document entitled "Debtor's Motion for Order Appointing Counsel, Fixing Fees, and for Disposition of Settlement Proceedings." Appellants' App. p. 176. The Trustees Office's document advised the bankruptcy court in part:

Come now Debtors, by counsel, and advise the Court that the Debtors have a cause of action for environmental damage allegedly caused to their residential real estate by a third party.

1. Debtors have suffered environmental damage to their residential real estate as the result of acts of the Texas Eastern Products Pipeline Corporation, and have filed suit against Texas Eastern Products Pipeline Corporation in Jackson Circuit Court under Cause No. 36C01–9909–CP–120.

* * *

4. Upon recovery from settlement or suit, Debtors would propose that counsel should be required to immediately report such result to both the court and the Chapter 13 Trustee

. . . .

5. As regards to any net proceeds remaining in the hands of the Trustee, Debtors would propose that Chapter 13 counsel and the Trustee submit to the Court a proposal fixing the amount Debtor should be allowed to retain and amount available for plan creditors in the Chapter 13 case; further, Debtors would request that any such distribution proposal be noticed to all creditors and parties of interest before the Court's final approval of same.

Appellants' App. pp. 176–77.

At some point during the Robsons' bankruptcy proceedings, Firstar requested a copy of the Robsons' complaint against TEC. On November 23, 1999, the Robsons complied with Firstar's request and faxed them a copy of their complaint, which specifically referenced their personal injury allegations. Appellants' App. p. 393.

During bankruptcy proceedings, the Trustees Office provides a computer-based phone system for creditors to call and receive information regarding open bankruptcy estates. The information a creditor would have received concerning the Robsons' lawsuit against TEC stated:

Order appoint counsel for environmental damage claim. Counsel to supply court/trustee with notice of settlement or proceeds. Counsel to deduct contingency fee/necessary expense incurred. Net proceeds to be forwarded to Trustee for report to Court on final distribution.

Appellants' App. p. 385.

On June 6, 2003, the United States Bankruptcy Court for the Southern District of Indiana entered its final decree discharging the Robsons' trustee and closing the Robson bankruptcy estate. Appellants' App. p. 184. On June 26, 2003, the same court found that the Robsons had fulfilled all of their requirements under their bankruptcy plan and discharged their debts. Appellants' App. p. 187.

On November 10, 2003, TEC moved for partial summary judgment, asserting that

the Robsons lacked standing to pursue their personal injury claims and that the doctrine of judicial estoppel barred the Robsons' personal injury claims because the Robsons did not properly disclose their personal injury claims in their Chapter 13 bankruptcy schedules. On April 5, 2004, the trial court granted TEC's Motion for Partial Summary Judgment and dismissed the Robsons' personal injury claims. The trial court did not issue findings of fact or conclusions of law with its order.

On May 5, 2004, the Robsons filed a motion to correct error. The trial court did not rule on this motion, and the motion was deemed denied on June 20, 2004. The Robsons now appeal.

### Standard of Review

On appeal, the standard of review of a summary judgment ruling is the same as that used by the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C) (2005); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152 (Ind. 2005). All facts and reasonable inferences drawn therefrom are construed in favor of the non-moving party. *Id.* The review of a summary judgment motion is limited to those materials designated to the trial court. Trial Rule 56(H); *Gunkel*, 822 N.E.2d at 152. Motions for summary judgment must be ruled upon carefully so as not to deprive litigants of their day in court. *Id.*

### I. Judicial Estoppel

■ Judicial estoppel is a judicially created doctrine that seeks to prevent a litigant from asserting a position inconsistent with one asserted in the same or a previous proceeding. *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3rd Cir.1996). Judicial estoppel is not intended to eliminate all in-

consistencies; rather, it is designed to prevent litigants from playing "fast and loose" with the courts. *Id.* The primary purpose of judicial estoppel is not to protect litigants but to protect the integrity of the judiciary. *Johnson v. Trust Co. Bank*, 223 Ga.App. 650, 478 S.E.2d 629, 630 (1996), *cert. denied.*

■■ The basic principle of judicial estoppel is that, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory and then pursue an incompatible theory in subsequent litigation. *Id.* Judicial estoppel only applies to intentional misrepresentation, so the dispositive issue supporting the application of judicial estoppel is the bad-faith intent of the litigant subject to estoppel. *Burnes v. Pemco Aeroplex Inc.*, 291 F.3d 1282, 1286–87 (11th Cir.2002).

■ Judicial estoppel is applicable when a bankrupt debtor fails to disclose a cause of action as an asset in bankruptcy proceedings and then pursues the omitted cause of action in a subsequent proceeding. *See Ryan*, 81 F.3d at 358. When applying judicial estoppel in the bankruptcy context, it matters not that the party asserting judicial estoppel was not a party to the initial bankruptcy adjudication. *Id.* at 360.

There are some minor variances in the manner courts apply the doctrine of judicial estoppel to causes of action not scheduled as an asset in bankruptcy proceedings. *Compare Chandler v. Samford Univ.*, 35 F.Supp.2d 861, 864 (N.D.Ala. 1999) (shifting the burden of proof to the plaintiff-debtor after the party asserting judicial estoppel establishes certain underlying facts) *with Murray v. Bd. of Educ. of the City of N.Y.*, 248 B.R. 484, 487 (S.D.N.Y.2000) (applying a singular analysis with no burden shift).

■ The better-developed test is that found in *Ryan,* which provides that an "inference" of bad faith arises when the party asserting judicial estoppel demonstrates that a debtor-plaintiff had knowledge of an unscheduled claim and motive for concealment in the face of a duty to disclose. *See* 81 F.3d at 363; *see also Burnes,* 291 F.3d at 1287–88. If the party asserting judicial estoppel establishes knowledge of a claim and motive for concealment, the debtor-plaintiff then has the burden of coming forth with evidence indicating that the nondisclosure was made in good faith. *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 321 (3rd Cir.2003) (the inference of bad faith is rebuttable).

Accordingly, although knowledge and motive are very important in establishing judicial estoppel, the inquiry does not end there if the debtor-plaintiff comes forth with evidence indicating that the non-disclosure was conducted in good faith. *See Burnes,* 291 F.3d at 1286 (courts must always give due consideration to *all of the circumstances* of a particular case when considering the applicability of judicial estoppel). Furthermore, while applying this test, it is important to remember that the ultimate purpose of the test is to determine the actual presence of bad faith. *See Ryan,* 81 F.3d at 365 (judicial estoppel is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims).

### A. The Robsons' Disclosures

■ TEC claims that the Robsons' scheduling of their cause of action was deceptive because the phrase "[p]ollution lawsuit for environmental damages to debtors' residential property" is indicative of an intention to misled the Robsons' creditors into believing the Robsons were not pursuing damages for personal injuries. Br. of Appellee at 11.

TEC asserts that *Krystal Cadillac's* application of judicial estoppel is directly on point with the case at bar. Br. of Appellee at 16. We disagree. In *Krystal Cadillac,* the debtor-plaintiff filed the following amended disclosure statement:

Debtor also holds an Automobile Franchise Agreement with General Motors Corporation. However, the *status* of this franchise is now in litigation. General Motors terminated the franchise prior to the commencement of the case and the matter was in litigation at the time the Chapter 11 petition was filed. General Motors nevertheless proceeded with termination and the matter is now on appeal in the Commonwealth Court. Debtor takes the position, which is vigorously contested by General Motors, that this franchise agreement remains an asset of the [estate].

337 F.3d at 318 (emphasis added). *Krystal Cadillac* concluded that, in the absence of an indication that the plaintiff-debtor's suit was for damages and was capable of providing income for the bankruptcy estate, this statement evidenced an attempt by the plaintiff-debtor to play fast and loose with the courts. *Id.* at 325.

The Robsons' disclosure statement indicated that the Robsons had a cause of action for damages and that the suit could potentially provide revenue to their bankruptcy estate. Appellants' App. p. 150. The amended disclosure statement in *Krystal Cadillac* did not. Rather, the *Krystal Cadillac* amended disclosure statement merely indicated that the debtor-plaintiff's franchise agreement might be subject to termination.

As stated by *Krystal Cadillac:*
When [the Plaintiff] filed its Amended Disclosure Statement, it knew about each of the claims [for damages] it has

now included in this action. However, as quoted above, the Amended Reorganization Plan and Amended Disclaimer Statement *merely referenced [the Plaintiff's] position that the dealer agreements were part of the bankruptcy estate and the ongoing state proceedings wherein [the Plaintiff] was attempting to undo GM's termination of them.*

337 F.3d at 320 (emphasis added). Because the debtor-plaintiff in *Krystal Cadillac* failed to indicate that its cause of action was for damages and was capable of providing income to the bankruptcy estate while the Robsons did so indicate, the case at bar is distinguishable from *Krystal Cadillac*.

Importantly, not a single case cited by TEC or found by this court's independent research has applied the doctrine of judicial estoppel against a debtor-plaintiff who included his claim for damages in his bankruptcy schedules—as the Robsons did in the case at bar. *See Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 599 (5th Cir.2005); *Baker v. Dep't of Interior*, 125 Fed.Appx. 151, 152, 2005 WL 751946 (9th Cir.2005); *De Leon v. Comcar Indus.*, 321 F.3d 1289, 1291 (11th Cir.2003); *Casey v. Peco Foods, Inc.*, 297 B.R. 73, 75 (S.D.Miss.2003); *Burnes*, 291 F.3d at 1284; *Froshiesar v. Babij*, 2002 WL 31972189, at *2, 2002 U.S. Dist. LEXIS 25537 at *5 (D.Or. Dec. 11, 2002); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 781 (9th Cir.2001); *Chandler*, 35 F.Supp.2d at 862–63; *Browning Mfg. v. Mims (In re Coastal Plains)*, 179 F.3d 197, 203 (5th Cir.1999); *Ryan*, 81 F.3d at 357; *Johnson*, 478 S.E.2d at 630; *Hammes v. Brumley*, 659 N.E.2d 1021, 1028 (Ind.1995); *Valley Fed. Sav. Bank v. Anderson*, 612 N.E.2d 1099, 1101 (Ind.Ct.App.1993); *Schlosser v. Bank of W. Ind.*, 589 N.E.2d 1176, 1177 (Ind.Ct.App.1992); *Boucher v. Exide Corp.*, 498 N.E.2d 402, 403 (Ind.Ct.App. 1986).

The absence of direct case law support for TEC's position is not, in and of itself, fatal to TEC's claim of bad faith. Rather, the Robsons' inclusion of their cause of action and their cause number in their bankruptcy proceedings does not amount to an inference of bad faith as strong as that presented in the above-cited cases. When presented with a weak inference of bad faith, courts should and do pay close attention to the facts surrounding the debtor-plaintiff's scheduling to determine whether the debtor-plaintiff's scheduling amounted to an attempt to play fast and loose with the courts.

Here, the facts surrounding the Robsons' disclosure not only suggest good faith but further indicate that the Robsons actually complied with the bankruptcy's full disclosure requirement. When asked about the Robsons' full disclosure compliance after being advised of TEC's allegation of bad faith, United States Bankruptcy Trustee Black stated:

> In my experience, that [Robsons'] disclosure was consistent with standard bankruptcy practice and it was adequate to put all interested persons on notice of any and all legal claims arising from the present litigated matter. Greater detail or specificity with respect to parties, claims or defenses was unnecessary absent a request for further information.
> * * *
> [TEC] takes the position that the Robsons and their attorneys attempted to conceal the existence of the Robsons' personal injury claims from participants in the Chapter 13 proceedings. *Nothing could be further from the truth.*

Appellants' App. p. 401 (emphasis added).

Black also offered a benign explanation for the Robsons' wording of their schedule—a schedule that was not requested by the Robsons' creditors. Appellants' App.

pp. 381, 401. Black stated, "the actual purpose and effect of those references [to the damage to the Robson's personal property] was to alert interested parties to the damaged condition of the real estate[.]" *Id.* at 401.

Black has been a Chapter 13 trustee continuously since 1985 and has supervised approximately 10,000 Chapter 13 cases. Appellants' App. p. 374. With his experience, Black is likely far more familiar with the practical application of the bankruptcy's full disclosure requirement than any party associated with this action. Accordingly, Black's unequivocal indication that the Robsons' schedule *complied* with the bankruptcy disclosure requirements is of no small significance in our determination. Moreover, TEC offers absolutely no evidence of practical bankruptcy practice or procedure to contradict Black's indication that the Robsons' schedule complied with bankruptcy's requirement of full disclosure.

TEC also states, "[t]he Robsons' bankruptcy filings and orders, four in number, repeatedly referred only to environmental damage to the debtors' residential property." Br. of Appellee at 11. As TEC does not provide a citation for this assertion, it is difficult to surmise to which four filings and orders TEC is referring to. *Id.* However, in TEC's statement of facts, TEC repeatedly refers to alleged omissions in documents and orders prepared by the bankruptcy court or bankruptcy officials unaffiliated with the Robsons. Br. of Appellee at 2–5. Because we do not review the propriety of actions taken by federal bankruptcy courts or officials, the propriety of the documents prepared by such individuals are of no import to the case at bar. Furthermore, because the Robsons did not prepare the documents, it can hardly be said that the documents are indicative of their bad faith.

TEC next contends the Robsons failed to attach a copy of their complaint to their Chapter 13 schedules. Br. of Appellee at 11, 17. However, TEC fails to point us to a federal rule that requires the Robsons to attach a copy of their complaint to their Chapter 13 schedules, and Black specifically indicated that "nobody ever does that." Appellants' App. p. 382.

To deny a debtor-plaintiff access to state courts for failing to comply with a non-bankruptcy requirement has the practical effect of impermissibly adding substantive state law requirements to federal bankruptcy procedure. *See Hammes*, 659 N.E.2d at 1028 (Indiana courts are without jurisdiction to peripherally affect federal bankruptcy proceedings). Accordingly, absent an assertion that federal bankruptcy law required the Robsons to attach a copy of their complaint to their schedule and proof that we have concurrent state jurisdiction in this regard, we have no authority to consider TEC's claim.

TEC also asserts Black permitted the closing of the bankruptcy action and procured the Robsons' receipt of discharge without accounting for the Robsons' potential recovery under their complaint. Br. of Appellee at 11. As stated above, the propriety of Black's actions as a United States bankruptcy trustee are a matter for the federal courts.

TEC finally asserts the Robsons should be judicially estopped from pursuing their claims because they did not cure their defective scheduling by reopening the bankruptcy estate and amending their Chapter 13 schedule. Br. of Appellee at 11, 22–23.

Assuming for the sake of argument that the Robsons filed a defective schedule, the majority of jurisdictions hold that reopening a bankruptcy estate has no effect on the application of judicial estoppel. These

jurisdictions conclude that allowing reopening to cure nondisclosure encourages parties to play fast and loose with the courts, as debtor-plaintiffs would be able to use reopening to avoid any negative consequences of nondisclosure should they get caught. *See Burnes*, 291 F.3d at 1288; *De Leon*, 321 F.3d at 1291–92.

As aptly stated by the Third Circuit, such reopening merely amounts to "eleventh-hour candor" and should not be mistaken as good faith. *Krystal Cadillac*, 337 F.3d at 321; *see also Boucher*, 498 N.E.2d at 404 (a successful reopening motion suggests the trustee would not have abandoned the claim were he properly made aware of it); *contra Johnson*, 478 S.E.2d at 631–32 (three judges dissenting); *Murray*, 248 B.R. at 487–88.[1]

More importantly, Black—as the trustee in charge of the oversight of the Robsons' bankruptcy estate—emphatically and unambiguously asserts that the Robsons not only scheduled in good faith but actually complied with bankruptcy's full disclosure requirement. Appellants' App. pp. 401–02. The Robsons can hardly be blamed for following their bankruptcy trustee's practice and procedure.

### B. *Motive to Conceal*

TEC claims the Robsons had motive to conceal their personal injury claims so that the proceeds from those claims would go to the Robsons personally and not to their unsecured creditors. Br. of Appellee at 11. However, it is far from certain that the Robsons would have benefited by concealing their personal injury claims.

Had the Robsons' case settled during bankruptcy, *all* of the remaining funds—after the deduction of attorney fees and advanced costs—would have been immediately turned over to their Chapter 13 trustee for disbursement. As stated by Black:

Question: Where in any of these papers, Mr. Black, is there a reference to the proceeds from the personal injury claims.

Black: It's reference to *a suit*. You have—no where have I seen any document that had two different lawsuits. There's one lawsuit, one thing where I get *all* the money from. Now, if there's two lawsuits, I'm at a true loss. But if there's just one lawsuit, it's pretty clear that I require *all* the money turned over. [The Robsons] agreed to do that, did not conceal anything, did not try to strip out anything.

Appellants' App. p. 322 (emphasis added). As all of any possible settlement award—for personal injury or otherwise—would have been turned over to Black for disbursement to the Robsons' creditors, the Robsons' alleged motive to conceal is far from established.

TEC attempts to counter Black's notation by asserting that the Robsons' claim did not settle during bankruptcy and, thus, the turning over of the proceeds of a possible settlement is not entirely dispositive of the Robsons' motive. However, under Chapter 13—unlike Chapter 7—the debtor pays his debts over time by establishing a court approved plan while leaving the debtor in possession of the bankruptcy

---

1. It can be argued that our supreme court has adopted the minority position with regard to the import of reopening. *See Hammes*, 659 N.E.2d 1021. However, *Hammes'* holding was in the standing rather than judicial estoppel context. As stated in the next section of this opinion, nondisclosure analysis in the judicial estoppel context and nondisclosure in the standing context are not mutually inclusive. For this reason, the import of reopening in the judicial estoppel context is still an "open" question in Indiana.

estate. *Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 472 (7th Cir.1999) (citing 11 U.S.C. § 1303). Furthermore, a Chapter 13 payment plan usually does not last longer than three years and cannot last longer than five years. 11 U.S.C. § 1322(d).

Black specifically decided to allow the Robsons to independently control the litigation at bar because of the likely expense and *amount of time* involved in its pursuit.[2] Appellants' App. p. 402. The Robsons filed for Chapter 13 protection on August 25, 1999, and the Robsons' bankruptcy estate was closed on June 6, 2003. Because the Robsons' complaint did not produce income within the Chapter 13 time period, the Robsons' unsecured creditors would not have received a benefit from the Robsons' personal injury claims regardless of how they were scheduled.

### C. *The Robsons' Rebuttal Evidence*

The Robsons assert Black's knowledge of their personal injury claims establishes that their scheduling was done in good faith. Br. of Appellant at 20–21 (citing Appellants' App. pp. 378–79; *Sports Page, Inc. v. First Union Mgmt., Inc.*, 438 N.W.2d 428, 431–32 (Minn.Ct.App.1989) (where the trustee is aware of the claim, as indicated by an abandonment document, judicial estoppel is inapplicable); *In re Atkinson*, 62 B.R. 678, 680 (Bankr.D.Nev. 1986) (where the trustee has knowledge of a claim, it is sufficient to put him on inquiry notice and trustee abandonment is considered to be knowingly made); *In re Tarpley*, 4 B.R. 145, 146 (Bankr.M.D.Tenn. 1980)). TEC asserts that Black's knowledge of the Robsons' claim is irrelevant. Br. of Appellee at 24 (citing *Froshiesar*,

2002 WL 31972189, at *1–2, 2002 U.S. Dist. LEXIS 25537 at *4).

We reject both the Robsons' and TEC's interpretation of the case law on this subject and believe that the seemingly contradictory cases cited by each party are reconcilable. *Froshiesar* did not indicate that a court may not consider trustee notification of an unscheduled claim as evidence of the debtor's good faith; rather, *Froshiesar* indicated that notification of the trustee is "insufficient" to escape judicial estoppel. *Froshiesar*, 2002 WL 31972189, at *4, 2002 U.S. Dist. LEXIS 25537 at *11 (citing *Hamilton*, 270 F.3d at 784).

We agree with *Froshiesar* and *Hamilton's* indication that notification of the trustee of an unscheduled asset should not create a hard and fast rule constituting sufficient evidence to defeat a judicial estoppel claim. When determining whether judicial estoppel is applicable, the dispositive question is not whether the trustee was aware of the unscheduled claim; the dispositive question is whether the debtor-plaintiff was playing fast and loose with the courts. *Ryan*, 81 F.3d at 358.

Trustee notification could suggest a good-faith attempt to comply with bankruptcy disclosure requirements in some contexts and might not in others. For this reason, trustee notification by itself is not "sufficient" evidence of good faith. Rather, trustee notification should be considered in context with the other evidence to make a commonsense determination as to whether the debtor-plaintiff was playing fast and loose with the courts.

Unlike the cases cited by TEC, the Robsons listed their cause of action in their bankruptcy schedules and the cause num-

---

**2.** The Robsons' attorney fees in this case were over $200,000.00 well before the filing of this appeal, and the Robsons have yet to receive settlement or judgment nearly six years after filing for Chapter 13 protection. Appellants' App. p. 335. Black's conclusion was well founded.

ber for the Robsons' complaint was made part of the bankruptcy proceedings. Appellants' App. pp. 150, 176–77. If the Robsons were attempting to play fast and loose with the bankruptcy court by wording their cause of action in a confusing manner, allowing the person who may oppose their discharge to have knowledge of their allegedly hidden personal injury claim would significantly jeopardize their attempt to deceive the court. *See* 11 U.S.C. § 704(6). TEC's claim that the Robsons attempted to hide their claim and the undisputed fact that the Robsons allowed the person responsible for the oversight of their bankruptcy action to have knowledge of the allegedly hidden claim are incommensurable. Accordingly, Black's knowledge of the Robsons' claim suggests good faith on the part of the Robsons.

TEC also asserts that Black's knowledge of the Robsons' claim is not indicative of good faith because the Robsons did not tell Black that they valued their claim against TEC at nearly $3,000,000 or that they had demanded a settlement from TEC in this amount. Br. of Appellee at 11. Given Black's considerable experience in overseeing Chapter 13 claims, it is simply implausible to believe that Black would be at all surprised by the fact that there are requests for settlement in personal injury/property damage cases and that those requests might be for a substantial amount. Rather, what was of interest to Black was that, should the Robsons' claim actually settle during their bankruptcy, he would receive the proceeds from that settlement for disbursement to the Robsons' creditors.

Moreover, it is equally implausible that Black's decision to allow the Robsons to direct their litigation would have been affected had the settlement offer been for $3000 or $30,000,000. The Robsons' unse-

cured debt was roughly $22,000. Black's decision to allow the Robsons to control the litigation at bar was based upon his experienced determination that the time involved in pursuing the Robsons' claims made trustee control of the claims unfeasible; it was not based upon the amount he believed the Robsons would recover. Appellants' App. p. 402.

The Robsons also (1) sent a copy of their complaint—including their personal injury count—to Firstar and (2) sent letters to Firstar and Republic, which specifically notified Firstar and Republic of their personal injury cause of action. Appellants' App. pp. 391–93. The Robsons claim that these two facts are indicative of their good faith.

TEC contends these letters are of no import because they were not sent to the Robsons' Chapter 13 trustee. Br. of Appellee at 11. However, TEC does not demonstrate why the Robsons would renotify Black of a cause of action that he adamantly insists he already knew about. TEC also asserts that the letters in question did not refer to the Robsons' bankruptcy. Br. of Appellee at 17. However, it can hardly be said that a large creditor would not likely know about one of their debtors' bankruptcy filing. Moreover, TEC fails to demonstrate why Firstar would ask for a copy of the complaint if it were unaware of the Robsons' bankruptcy.

TEC finally notes that the Robsons did not send similar letters discussing their personal injury claim to their unsecured creditors. *Id.* TEC's assertion misses the import of the letters. The Robsons' letters are not being used to assert that their creditors learned of their personal injury claims as a result of the letters. Rather, the Robsons assert that a party attempting to play fast and loose with the courts generally does not air claims they are at-

tempting to hide from bankruptcy proceedings.

Furthermore, the Robsons' Chapter 13 plan discharged $18,831.28 in unsecured debt. Appellants' App. p. 306. As TEC repeatedly insists that the Robsons believed their claim was worth nearly $3,000,000, it is hard to believe that the Robsons—who were represented—would risk the criminal penalties associated with a fraudulent disclosure or the $3,000,000 judgment itself for unsecured debt over 150 times smaller than their cause of action's purported worth. *See* 18 U.S.C. § 152(1) (debtor concealment of property in bankruptcy proceedings is punishable by a prison sentence of not more than five years).

### D. *Summary Judgment*

Summary judgment is particularly problematic in the case at bar because the ultimate issue to be decided is the Robsons' intent to play fast and loose with the courts. *See Best Homes v. Rainwater*, 714 N.E.2d 702, 707 (Ind.Ct.App.1999) (issues concerning state of mind are ordinarily improper for summary judgment); *see also Murray*, 248 B.R. at 488 (bankruptcy judicial estoppel is more troubling in the summary judgment context). Summary judgment is inappropriate even in instances where the facts are not in dispute, if inferences from those facts can be drawn in favor of the non-movant. *Rogers v. Grunden*, 589 N.E.2d 248, 256 (Ind.Ct. App.1992), *trans. denied.*

The inferences from the undisputed facts of this case do not establish that the Robsons failed to comply with the requirements of federal bankruptcy law. The inferences from the undisputed facts also do not establish that the Robsons had a motive to deceive their creditors. Finally, the rebuttal evidence presented by the Robsons suggests that their actions were not indicative of an attempt to deceive their creditors.

As stated by Black:

> Based on my familiarity with bankruptcy proceedings generally and my personal knowledge of the Robson Chapter 13 proceeding specifically, it is my opinion there is no basis whatsoever to believe that either the Robsons or their attorneys misled anyone with respect to their personal injury claims.

Appellants' App. p. 402. These facts and statements clearly create genuine issues of material fact. Accordingly, summary judgment is inappropriate for this issue.

### II. Standing

■ A debtor's failure to schedule a cause of action as an asset in bankruptcy may also deprive the debtor of state court standing to pursue the unscheduled claim. Unless a claim is scheduled by the debtor-plaintiff and abandoned by the bankruptcy trustee, the claim may no longer be pursued by the debtor-plaintiff. *Hammes*, 659 N.E.2d at 1026 n. 4.

■ The absence of standing effectively prevents a plaintiff from pursuing an action and restrains the court from exercising its general jurisdiction over any issue in the case. *Schlosser*, 589 N.E.2d at 1179; *see also Valley Fed. Sav. Bank*, 612 N.E.2d at 1103; *Boucher*, 498 N.E.2d at 403 (the fact that the debtor-plaintiff did not list his cause of action on his bankruptcy schedule prevented abandonment by the trustee).

TEC claims that the Robsons' title of their claim, as listed in their bankruptcy schedule, confused Black as to the Robsons' personal injury claims and deprives them of standing. Br. of Appellee at 36. However, unlike previous Indiana cases applying the doctrine of standing to bankruptcy nondisclosure, (1) the Robsons dis-

closed their claim and (2) Black permitted the Robsons to pursue their claim. Appellants' App. pp. 150, 176–77.

The rule of standing permits state court consideration of the claim at issue when it is (1) disclosed and (2) abandoned by the trustee.

> The implicit foundation for the Indiana decisions denying standing to debtor-plaintiffs is that the bankruptcy trustee has the only cognizable stake in the outcome of the tort claim. If the tort claim is part of the bankruptcy estate, this foundation is valid. If, however, the bankruptcy court abandons the claim, the foundation loses its logic. *After the bankruptcy court abandons a claim, the debtor-plaintiff has the requisite personal stake to pursue the claim vigorously.* Once the personal stake is regained, Indiana's purpose in applying the standing doctrine is fulfilled, and the doctrine should no longer bar the plaintiff from a day in court.

*Holiday v. Kinslow,* 659 N.E.2d 647, 650–51 (Ind.Ct.App.1995) (emphasis added).

Tellingly, TEC cites *Krystal Cadillac* for its assertion that the doctrine of standing may be applied in instances where the plaintiff listed their cause of action in their bankruptcy schedule but did so in a manner intending to deceive. Br. of Appellee at 37. *Krystal Cadillac* did not rely upon or analyze the doctrine of standing when it dismissed the debtor-plaintiff's complaint; rather, *Krystal Cadillac* relied upon the doctrine of judicial estoppel. 337 F.3d at 316.

■ The doctrine of standing should remain limited to instances where complete non-disclosure on the part of the debtor-plaintiff precluded the trustee from properly abandoning the debtor's claim. When a debtor-plaintiff completely fails to bring a claim to the attention of the trustee, there is little concern that the debtor-plaintiff may have acted in good faith or that the party asserting standing is attempting to use technicalities to deprive the plaintiff of his day in court. However, when a debtor-plaintiff actually lists a cause of action in their bankruptcy schedules, there is a strong possibility that the debtor-plaintiff was acting in good faith.

■ We decline to extend the doctrine of standing to encompass circumstances where the debtor-plaintiff listed the cause of action within their bankruptcy schedules and the trustee permitted the claim to be pursued by the debtor-plaintiff. Any claim of the inadequacy of such a disclosure should be addressed under the doctrine of judicial estoppel, which better serves to protect the integrity of the courts in such circumstances and protects a debtor-plaintiff from a party seeking to use "technicalities" to "derail potentially meritorious claims." *See Ryan,* 81 F.3d at 365. Accordingly, TEC's standing claim fails.

### Conclusion

The undisputed facts of this case do not entitle TEC to judgment as a matter of law on grounds of judicial estoppel or on the invocation of the doctrine of standing.

The trial court's entry of summary judgment is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

DARDEN, J., and CRONE, J., concur.