**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 31 2012, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SUSAN GRUND, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No. 52A02-1108-PC-791 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE MIAMI CIRCUIT COURT
The Honorable William C. Menges, Jr., Special Judge
Cause No. 52C01-0609-PC-2

**May 31, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Petitioner Susan Grund appeals from the post-conviction court's denial of her petition for post-conviction relief ("PCR"). As restated, Grund argues that (1) the doctrine of judicial estoppel prevents the State from making its merits argument in this post-conviction proceeding and (2) her due process rights to a fair trial were violated when the prosecutor spoke with some of the jurors from her first trial. We affirm.

## FACTS AND PROCEDURAL HISTORY

The Indiana Supreme Court related the facts underlying this case in its disposition of Grund's direct appeal:

> In the spring and summer of 1992, Susan and Jim Grund were experiencing marital problems. They were arguing frequently, and they were seeing a marriage counselor. Although there was some talk of divorce, this was not what Susan wanted. Because her husband was a prominent attorney, she feared losing custody of the children, and she feared losing Jim's financial support. Thus, Susan needed an alternative solution.
>
> On the afternoon of July 4, 1992, Susan arrived unexpectedly at the home of David Grund, the victim's son by a previous marriage. She had been at the county fairgrounds, and as she returned home, she stopped in, claiming to have found a new shortcut home from the fairgrounds. Defendant questioned David about a handgun that he had recently purchased. David showed her where he kept his 9 mm semi-automatic weapon, and allowed her to handle it. Before leaving, defendant noticed that the storm door was broken and was secured by a shoestring. Defendant also inquired about where David and his girlfriend, Suzane, kept their rottweiler puppy when no one was at home.
>
> Around 2:00 p.m. that day, David and Suzane attended a barbecue at the home of Suzane's parents. Defendant and her husband, along with their two children, thirteen-year-old Jacob and seven-year-old Tanelle, arrived around 4:00 p.m. and stayed until around 6:00 p.m. Shortly before dark, defendant telephoned Suzane's parents to find out if David and Suzane planned to attend the fireworks display. She was told that David was not feeling well, so they would be staying at Suzane's parents' home for a while longer, then they would return home. When David and Suzane arrived home around 10:30 p.m., they found that their home had been burglarized. Although cash and jewelry were in plain sight, the only thing missing was David's gun. Meanwhile,

Susan had taken her two children and several other boys to see the fireworks. Unfortunately, when they got there, Susan was unable to find a place to park. She dropped off the boys and kept Tanelle with her. They rendezvoused at the ice cream stand shortly after the fireworks were over.

On August 3, 1992, defendant arranged for Jacob to spend the night with his cousin, Steven, in the newly acquired family camper. She also arranged for Steven's sister, Andrea, to spend the night at her home with Tanelle. At approximately 10:00 p.m., she left the two boys at the campground. Now alone, defendant went to obtain beverages for the boys. About an hour later, she picked up the girls at her mother's house, and the three arrived at the camper around 11:15 p.m. She gave the beverages to the boys and took the girls home.

Just prior to midnight, defendant called the Miami County emergency phone number to request an ambulance. She told the dispatcher that she had found her husband lying on the couch in the bedroom with blood coming out of his eyes and mouth. Jim Grund was already dead when the emergency workers arrived. The cause of death was a single gunshot wound to the head. Although there were no signs of struggle, there were two open suitcases on the floor with women's clothing strewn around them, and several dresser drawers were open with items pulled out. There were no signs of forced entry.

Detectives found a spent shell casing on the floor and recovered a spent bullet from the couch in the area where Jim's head had been. Both appeared to be from a 9 mm semi-automatic handgun. The detectives were aware that a similar weapon recently had been stolen from David's house. The next morning, they asked David for locations where he might have fired the weapon. As a result of this questioning, police recovered a bullet from a telephone pole which was located across the street from David's former residence. This bullet and the one recovered from the murder scene had been fired from the same gun.

Approximately two weeks after the murder, Susan, Jacob, Tanelle, and Susan's mother moved from Peru to Vincennes. On September 3, a former neighbor informed Susan that police were searching her home in Peru. That night, she met her sister, Darlene Worden, at a McDonald's near Indianapolis. As the two women drove to Peru, Susan confessed that she had killed her husband. According to defendant, it was supposed to be a double suicide, but she had been unable to kill herself. She claimed that instead of shooting himself, Jim made her shoot him so that his will would remain effective.

When Susan and her sister arrived at Susan's Peru home, defendant went directly to the laundry room, and told Darlene that "it" was still there. When they left the house, Susan was carrying two teddy bears, one of which had been ripped open across the back. She later admitted that she removed the gun from the house by hiding it in one of the bears. Susan then returned to

3

Vincennes. Sometime later, Darlene's husband brought a bag of cement to her in Vincennes.

Around the beginning of November, Darlene happened to see the detective who was investigating the murder. Darlene believed that her mother was aware of Susan's actions, and she feared repercussions, both for herself and for her mother. She also believed that the gun was in Susan's home, and she was concerned for the children's safety. As a result, Darlene told the detective about Susan's confession. Susan was arrested on November 4, 1992.

The next summer, when Susan's mother was planning to move back to Peru, she found a family heirloom, a large copper kettle, in the attic. It was filled with cement. She took it back to Peru and gave it to the police. When police broke the cement, they found a 9 mm semi-automatic weapon, the same gun which had been stolen from David's house and used to kill Jim Grund.

*Grund v. State*, 671 N.E.2d 411, 414-15 (Ind. 1996).

The State charged Grund with murder, a felony, and her first trial began on September 22, 1993. On October 1, 1993, the trial was declared a mistrial when the jury was unable to reach a verdict. Following the mistrial, Miami County Prosecutor Wilbur Siders invited all of the members of the jury to discuss the trial but did not invite Grund's trial counsel to participate or advise counsel of his intent to conduct the meeting. Prosecutor Siders indicated that only those who had voted guilty attended the meeting, nothing of value was gleaned from it, and nothing he learned from it shaped his approach in the second trial. On March 16, 1994, a second jury found Grund guilty as charged, and the trial court later sentenced her to sixty years of incarceration. On direct appeal, the Indiana Supreme Court affirmed Grund's conviction and sentence.

On August 23, 2006, Grund filed a petition for post-conviction relief ("PCR"). On June 15, 2008, Grund filed a motion to call a member of the second jury as a witness, a motion related to her claim that the juror had been improperly seated. The State opposed the

4

motion to call the juror as a witness, and, on August 25, 2008, the post-conviction court denied it. On March 24, 2009, Grund filed an amended PCR petition, adding the claimed ground of relief that her due process rights had been violated by Prosecutor Siders's meeting with jurors from her first trial. On April 30, 2010, the post-conviction court held a hearing on Grund's PCR petition. On August 15, 2011, the post-conviction court denied Grund's PCR petition, concluding that the meeting with the jurors from her first trial was not improper, the State had been prejudiced by Grund's unreasonable delay in filing her PCR petition, and the doctrine of judicial estoppel did not bar the State from arguing that its meeting jurors from the first trial was proper.

## DISCUSSION

### *PCR Standard of Review*

Our standard for reviewing the denial of a PCR petition is well-settled:

> In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting its judgment. The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. To prevail on appeal from denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court…. Only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, will its findings or conclusions be disturbed as being contrary to law.

*Hall v. State*, 849 N.E.2d 466, 468, 469 (Ind. 2006) (internal citations and quotations omitted).

### I. Whether the State's Argument is Barred by the Doctrine of Judicial Estoppel

Grund argues that the doctrine of judicial estoppel should bar the State from being

able to argue in this post-conviction proceeding that its meeting with jurors from the first trial was proper when it opposed her motion to call a juror from the second trial as a witness. "[J]udicial estoppel prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted." *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998), *trans. denied*.

> Judicial estoppel is not intended to eliminate all inconsistencies; rather, it is designed to prevent litigants from playing "fast and loose" with the courts. [*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3rd Cir. 1996).] The primary purpose of judicial estoppel is not to protect litigants but to protect the integrity of the judiciary. *Johnson v. Trust Co. Bank*, 223 Ga. App. 650, 478 S.E.2d 629, 630 (1996), *cert. denied*.
> The basic principle of judicial estoppel is that, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory and then pursue an incompatible theory in subsequent litigation. *Id*. Judicial estoppel only applies to intentional misrepresentation, so the dispositive issue supporting the application of judicial estoppel is the bad-faith intent of the litigant subject to estoppel. *Burnes v. Pemco Aeroplex Inc.*, 291 F.3d 1282, 1286-87 (11th Cir.2002).

*Robson v. Tx. E. Corp.*, 833 N.E.2d 461, 466 (Ind. Ct. App. 2005), *trans. denied*.

The threshold question, then, is whether the State's prior position was inconsistent with its current argument, and we conclude that it was not. As the State points out, the purposes for the communication, and the contexts in which they were to occur, were completely different. In seeking to call a former juror from her second trial as a witness, Grund was attempting to impeach the juror's guilty verdict, which is a legitimately objectionable practice. "It has long been the general rule in this state that the verdict of a jury may not be impeached by the testimony or affidavit of a juror." *Johnson v. State*, 173 Ind. App. 191, 197, 362 N.E.2d 1185, 1188 (1977). On the other hand, the State attempts in this

6

appeal to defend its communication with members of a completely different jury who reached no verdict to impeach. Whatever the merits of these positions may be, they are in no way inconsistent. The State is not barred by the doctrine of judicial estoppel from arguing that its communication with jurors from Grund's first trial was proper.

## II. Whether the State's Communication with Jurors from Grund's First Trial was Improper[1]

### A. Rule of Professional Conduct 3.5

Grund contends that Indiana Rules of Professional Conduct prohibited the sort of communication Prosecutor Siders had with members of the first jury. At the time of Grund's first trial, Rule of Professional Conduct 3.5 provided:

> A lawyer shall not:
> (a)  seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
> (b)  communicate ex parte with such person except as permitted by law; or
> (c)  engage in conduct intended to disrupt a tribunal.

Ind. Professional Conduct Rule 3.5 (1993).

By its plain language, Rule 3.5 did not apply to the conduct complained of by Grund. Rule 3.5 applied to jurors or prospective jurors, not *discharged* jurors. As we have noted regarding Rule 3.5 as it existed at the time of Grund's first trial, "the prohibition against ex parte communication with a "juror" or "prospective juror" does not extend to a person who

---

[1]  The State also argues that Grund should not be able to bring this freestanding claim in a post-conviction proceeding and that the post-conviction court's conclusion that her claim should be barred by laches should be affirmed. Keeping in mind our preference for deciding claims on the merits, we choose to reach the merits of Grund's claim.

7

previously served as a juror." *Koo v. State*, 640 N.E.2d 95, 104 n.6 (Ind. Ct. App. 1994), *trans. denied*. "It is axiomatic that once a person has been excused from jury duty, he or she is no longer a juror or prospective juror as those terms are used in the Rules." *Id.* The Rules of Professional Conduct did not prevent Prosecutor Siders from contacting the jurors from Grund's first trial afterward.[2]

## B. Indiana Case Law

Grund also claims that Indiana case law supports her argument. We have held, however, that "[p]ost trial jury contact by attorneys representing either side in litigation is a common practice in this State and largely rests within the trial court's broad discretion." *Koo*, 640 N.E.2d at 105. "Such contact should not be discouraged where it is used as a learning tool to assist counsel in subsequent cases." *Id.* There is no indication that Prosecutor Siders's contact with former jurors was ever intended to be used as anything other than a learning tool. Prosecutor Siders testified that he "wanted to know how they perceived the evidence, what they were missing, what their hangups were, and any suggestions they had[.]" Appellant's App. pp. 97-98. We see nothing in the record, and Grund points to

---

[2] Rule of Professional Conduct 3.5 currently reads as follows:

A lawyer shall not:
(a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
(b) communicate ex parte with such a person during the proceeding unless authorized to do so by law or court order;
(c) communicate with a juror or prospective juror after discharge of the jury if:
    (1) the communication is prohibited by law or court order;
    (2) the juror has made known to the lawyer a desire not to communicate; or
    (3) the communication involves misrepresentation, coercion, duress or harassment.
(d) engage in conduct intended to disrupt a tribunal.

nothing, that would take this case outside the general rule expressed in *Koo*.

All of the Indiana cases cited by Grund are easily distinguished. The Indiana Supreme Court has stated that "[p]ost-trial investigations of jurors should be the exception, not the rule." *State v. Dye*, 784 N.E.2d 469, 477 (Ind. 2003). The Indiana Supreme Court has also stated that "[w]hile impermissible harm can accrue to defendants when juries are improperly influenced by extraneous information…, we agree with the post-conviction court that protection of the jurors' interests in privacy and repose is ample reason to require some hint of a problem before granting a motion to disclose the jurors' names." *Matheney v. State*, 688 N.E.2d 883, 894 (Ind. 1997). *Dye* and *Matheney*, however, were both cases in which the defendant sought to communicate with a juror in order to impeach a guilty verdict based on allegations of jury misconduct. As previously mentioned, "[i]t has long been the general rule in this state that the verdict of a jury may not be impeached by the testimony or affidavit of a juror." *Johnson*, 173 Ind. App. at 197, 362 N.E.2d at 1188. Prosecutor Siders was not seeking to impeach a verdict, as none had been rendered. *Dye* and *Matheney* are inapposite.

Grund also points to *Matter of Berning*, 468 N.E.2d 843 (Ind. 1984), a disciplinary action in which a prosecutor was publicly reprimanded for sending a letter to jurors who had acquitted the defendant in a domestic case that read, in part,

> Needless to say, everyone involved in the prosecution of the case was terribly upset and shocked at the verdict of not guilty. Marilyn Martin had the difficult task of trying to explain to her children why Mr. Martin was able to get away with such an act without being punished for it. The victim was in tears because the finding of not guilty meant to her that the jury felt that she was a liar. The mother of the victim was in tears for the same reason. Even Steve Mullins was visibly upset by the finding of not guilty, and he is, in my opinion, not the type to let adverse decisions affect him emotionally. However, my

9

purpose in writing is not to 'cry over spilled milk' because we lost the decision.

What I would like to do is get some insight from you as to how I should handle domestic violence cases. Our office has been criticized in the past for not doing more to help victims of domestic violence and, in particular, women who are beaten by their husbands. In the Martin case, we had a situation that stemmed from an ex-husband and ex-wife situation. The husband has been violent toward Mrs. Martin in the past, and, I'm afraid, will be violent toward her in the future. With three eyewitnesses to the event, the State had the absolute best possible case it could ever have. We seldom, if ever, have a witness to this type of offense other than the victim herself. Therefore, the message that I get from your decision as a juror is that I, as the prosecutor in this county, should not file domestic-type crimes at all.

I would really appreciate your contacting me in order to speak with me on the telephone or come in to see me in person. The next time that I have a woman in my office who claims to be the victim of being battered by her husband, I will advise her that I will not file the charge because of my past experiences in these types of cases. One of those cases is the Martin case where the State had three eyewitnesses to the battery and yet the defendant was found not guilty. If I am interpreting your decision incorrectly or I am getting the wrong message from your decision, I would really appreciate hearing that from you.

*Id*. at 844. The letter produced reactions "include[ing] irritation, feelings of being harassed, anger, displeasure and embarrassment [and s]ome felt the letter would influence their future jury service." *Id*. at 844. The problem in *Berning* was not that the post-trial communication occurred, it was that the content of the communication was improper. Here, there is not the slightest indication in the record of criticism, coercion, harassment, or other impropriety on Prosecutor Siders's part. Grund's reliance on *Berning* is unavailing.

We acknowledge that some other jurisdictions seem to disfavor post-trial contact between attorneys and jurors in general. *See, e.g.*, *U.S. v. Kepreos*, 759 F.2d 961, 967 (1st Cir. 1985); *U.S. v. Moten*, 582 F.2d 654, 665-66 (2nd Cir. 1978). It has been observed, however, that

10

> [c]ourts which have upheld the power of a trial court to prohibit posttrial contact between jurors and attorneys have done so in order to (1) avoid harassment of jurors, thereby encouraging freedom of discussion in the jury room, (2) reduce the number of meritless posttrial motions, (3) eliminate a significant source of jury tampering, and (4) increase the certainty of verdicts.

Dale R. Agthe, J.D., Annotation, *Propriety of attorney's communication with jurors after trial*, 19 A.L.R.4th 1209 (1983). While we concede that unrestricted communication between discharged jurors and counsel could lead to any or all of the evils listed above, none is implicated in this case. We decline the invitation to adopt a broad policy disfavoring post-trial contact between jurors and attorneys under such circumstances. We conclude that Grund has failed to establish that there was anything improper about Prosecutor Siders's post-trial contact with jurors from her first trial.

## CONCLUSION

The State is not barred by the doctrine of judicial estoppel from arguing in this post-conviction proceeding that the State's contact with jurors from Grund's first trial was proper. Moreover, we conclude that Grund has failed to establish that there was anything improper about the State's contact with jurors in this case. Grund has failed to establish that she is entitled to post-conviction relief.

The judgment of the post-conviction court is affirmed.

VAIDIK, J., and CRONE, J., concur.

11